CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS     FILED

STATE OF LOUISIANA

NO: 09-5510 DIVISION: L     SECTION: 6

BARON & BUDD, P.C., THE LAW OFFICE OF BERNARD L. CHARBONNET, JR., APLC and BERNARD L. CHARBONNET, JR., individually

VERSUS

BERMAN, DEVALERIO, & PEASE, LLP a/k/a BERMAN DEVALERIO, ATTORNEYS AT LAW

FILED: _____     _____
                                           DEPUTY CLERK

### PLAINTIFFS' ORIGINAL PETITION FOR DECLARATORY JUDGMENT AND GENERAL DAMAGES

**NOW INTO COURT,** through undersigned counsel, come Plaintiffs, Baron & Budd, P.C., The Law Office of Bernard L. Charbonnet, Jr., APLC, and Bernard L. Charbonnet, Jr., individually, and file this, their Original Petition for Declaratory Judgment and respectfully aver the following:

### PARTIES AND JURISDICTION

1.     The Law Office of Bernard L. Charbonnet is a Professional Law Corporation domiciled and licensed in and doing business in the Parish of Orleans, State of Louisiana. Plaintiff, Bernard L. Charbonnet, Jr. is a resident and domiciliary of the Parish of Orleans, State of Louisiana.

2.     Plaintiff, Baron & Budd, P.C. ("Baron & Budd") is a Texas Professional Corporation licensed to do business in and doing business in Dallas, Texas.  Baron & Budd is the successor-in-interest to Louisiana law firm LeBlanc & Waddell, LLC's contract that is the subject of this suit.

3.     Defendant, Berman DeValerio & Pease, LLP a/k/a Berman DeValerio ("Defendant"), is a law firm licensed to do business in and doing business in Boston, Massachusetts. Defendant is a successor-in-right to the Massachusetts law firm Berman DeVelario Pease Tobacco Burt & Pucillo, Attorneys at Law.

4.     This Court has general and specific jurisdiction over Defendant as Defendant has purposely availed itself of the privileges and benefits of conducting business in Louisiana through:

PLAINTIFFS' ORIGINAL PETITION
FOR DECLARATORY JUDGMENT

EXHIBIT
**A**

a) its contract with the Louisiana law firm LeBlanc & Waddell, LLC and its successor-in-interest, Baron and Budd, PC;

b) its contract with the Louisiana law firm The Law Office of Bernard L. Charbonnet, Jr., APLC, or, in the alternative, with Louisiana resident Bernard L. Charbonnet, Jr.;

c) its provision of securities litigation legal services to the Louisiana State Employees' Retirement System ("LASERS");

d) by its breach of the Louisiana contracts which are the subject of this suit; and

e) by otherwise doing business and purposefully undertaking actions in Louisiana sufficient to support the exercise of this Court's jurisdiction.

5.    Venue is proper as Plaintiffs, The Law Office of Bernard L. Charbonnet, Jr., APLC, and Bernard L. Charbonnet, Jr., are residents and domiciliaries of residents of the Parish of Orleans, State of Louisiana.

<u>**STATEMENT OF FACTS**</u>

6.    <u>**On February 2, 2001**</u>, Plaintiffs, LeBlanc & Waddell, LLC, The Law Office of Bernard L. Charbonnet, Jr., APLC, and Bernard L. Charbonnet, Jr., and Defendant, Berman, DeValerio, and Pease, LLP entered into agreement in principle to provide legal services in connections with securities litigation cases on behalf of clients residing within in the State of Louisiana. Said agreement called for payment of fees by Defendant to Plaintiffs, LeBlanc and Waddell, LLC, The Law Office of Bernard L. Charbonnet, Jr., APLC (or, alternatively, to Bernard L. Charbonnet, Jr.).

7.    <u>**On June 19, 2001**</u>, all three parties, LeBlanc & Waddell, LLC, The Law Office of Bernard L. Charbonnet, Jr., APLC (or, alternatively, Bernard L. Charbonnet, Jr.) and Defendant, signed a superseding letter agreement, stating that Defendant would calculate Plaintiffs' fees for securities litigation cases as a percentage of the *<u>"total compensation awarded to Defendant," to the exclusion of any deduction for other referral fees payable to any other attorneys or firms.</u>* (See attached Exhibit "A").

8.    No subsequent agreements, modifications or addendums with regard to payment were ever executed or discussed by the parties.

9.      Shortly thereafter, Plaintiffs became participatories and began providing the aforementioned legal services to Louisiana clients in connection with a class action suit entitled *Russell Carlson, Individually And On Behalf Of All Others Similarly Situated v. Xerox Corporation, KPMG LLP, Paul A Allaire, G. Richard Thomas, Anne Mulcahy, Barry D. Romeril, Gregory Tayler and Phillip Fishbach*, filed in the USDC District of Connecticut under Case No. 3:00-CV-1621 (AWT). Defendant, Berman, DeValerio, and Pease, LLP, served as one of several lead counsel in this litigation. Moreover, upon settlement of this matter, the District Court issued a judgment dated January 14, 2009 awarding Plaintiffs' counsel attorney's fees equal to sixteen percent (16%) of the Settlement Fund, plus reimbursement of expenses (See attached Exhibit "B", specifically page 27).

10.     <u>On December 7, 2005</u>, Berman DeVelario & Pease, LLC sent a letter to The Law Office of Bernard L. Charbonnet, Jr., (or, alternatively, Bernard L. Charbonnet, Jr.) terminating the June 19, 2001 agreement. In this letter, Berman DeVelario & Pease, LLC stated: "we want to make clear that *<u>all of the cases presently pending remain subject to the referral fee agreement as set forth in the June 19, 2001 letter and will be honored according to its terms.</u>*" (See attached Exhibit "C").

11.     Plaintiff, Baron & Budd, P.C., is the successor to LeBlanc & Waddell, LLC with respect to this agreement. Defendant, Berman DeVelario, is the successor to Berman DeVelario & Pease, LLC with respect to this representation agreement.

12.     In February 2009, upon settlement of the aforementioned class action suit, Defendant paid to Plaintiffs, Baron & Budd, P.C., and The Law Office of Bernard L. Charbonnet, APLC (or, alternatively, Bernard L. Charbonnet, Jr.) **fees which were calculated on a net basis, after first deducting fees that Defendant paid to other attorneys.**

13.     On March 16, 2009, and March 30, 2009, respectively, The Law Office of Bernard L. Charbonnet, Jr., APLC (or, alternatively, Bernard L. Charbonnet, Jr.,) and Baron & Budd, P.C. each notified Defendant that, pursuant to the controlling June 19, 2001, agreement signed by all parties, Defendant agreed to calculate Plaintiffs' referral fees as a percentage of Defendant's net total compensation, to the exclusion of any fees payable to other attorneys or firms. (See attached Exhibits "D" and "E").

**PLAINTIFFS' ORIGINAL PETITION                                        PAGE 3**
**FOR DECLARATORY JUDGMENT**

14.     Defendant responded by letter to Plaintiffs, The Law Office of Bernard L. Charbonnet, APLC (or, alternatively, Bernard L. Charbonnet, Jr.) and Baron & Budd, P.C., on **March 6, 2009** and **April 6, 2009,** respectively. In both responses, Defendant admitted that the June 19, 2001 letter agreement controls.  Nonetheless, Defendant has refused to honor the terms of the signed June 19th letter agreement and has not paid the remaining amounts due to Baron & Budd and The Law Office of Bernard L. Charbonnet, Jr., APLC (or alternatively, Bernard L. Charbonnet, Jr.).  (See attached Exhibits "F" and "G").

15.     Moreover, Plaintiffs aver that pursuant to the controlling agreement letter dated June 19, 2001, Plaintiffs' fees are to be calculated and derived from the "total compensation" awarded specifically to Defendant Berman DeVelario in the class action lawsuit referenced in Paragraph Seven (7) of this Petition. Plaintiffs aver that it is, therefore, necessary for Defendant to disclose the full value of said "total compensation." To date, Defendant has refused to provide this necessary information to Plaintiffs, despite Plaintiffs' numerous requests to do so.

### RELIEF REQUESTED

16.     Plaintiffs incorporate paragraphs 1-15 herein.

17.     Pursuant to Article 1871 of the Louisiana Code of Civil Procedure, Plaintiffs respectfully request that this Honorable Court declare Plaintiffs' right to fees calculated as a percentage of Defendant's total compensation as set forth in the controlling June 19, 2001 letter agreement.

18.     Pursuant to Article 1871 of the Louisiana Code of Civil Procedure, Plaintiffs respectfully request that this Honorable Court find Defendant liable to pay Plaintiffs' fees calculated as a percentage of Defendant's total compensation as set forth in the June 19, 2001 letter agreement.

19.     Plaintiffs seek recovery of all reasonable attorneys' fees, court costs and judicial interest from the date of demand until all fees are paid in full.

20.     All conditions precedent to the granting of relief herein requested have been satisfied.  By the filing of this action, Plaintiffs make no election of remedies and no waiver of any rights, claims or defenses.

**PRAYER**

**WHEREFORE**, Plaintiffs herein pray that Defendant be served with a certified copy of the foregoing petition and duly cited to answer same, and, after due proceedings had, there be judgment in favor of Plaintiffs, **BARON & BUDD, P.C. and THE LAW OFFICE OF BERNARD L. CHARBONNET, JR., APLC (or, alternatively, BERNARD L. CHARBONNET, JR.** and against Defendant, **BERMAN DEVELARIO**, as follows:

     1.     Declaring that the June 19, 2001, letter agreement executed by all parties is controlling and that Defendant is liable to pay Plaintiffs referral fees calculated as a percentage of Defendant's total compensation as set forth in the June 19, 2001 letter agreement.

     2.     Ordering Defendant to disclose the "total compensation" amount awarded specifically to Defendant Berman DeVelario in connection with the class action suit entitled *Russell Carlson, Individually And On Behalf Of All Others Similarly Situated v. Xerox Corporation, KPMG LLP, Paul A Allaire, G. Richard Thomas, Anne Mulcahy, Barry D. Romeril, Gregory Tayler and Phillip Fishbach*, filed in the USDC District of Connecticut under Case No. 3:00-CV-1621 (AWT).

     3.     Casting Defendant with all reasonable attorneys' fees and costs and judicial interest from the date of demand in connection with this suit;

     3.     Such other and further relief to which Plaintiffs may be justly entitled and that this Honorable Court deems just, necessary and proper under the circumstances.

Respectfully submitted:

W. Patrick Klotz
(Louisiana Bar Roll No. 17877)
One Canal Place
365 Canal Street, Suite 1700
New Orleans, Louisiana 70130
504-821-9900 (Office)
504-821-8080 (Facsimile)
pklotz@bellsouth.net

and

**VINSON & ELKINS LLP**
William D. Sims, Jr.
(Texas State Bar No. 18429500)
*Of Counsel*
Daniel L. Tobey
(Texas State Bar No. 24048842)
*Of Counsel*
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Telephone: (214) 220-7703
Facsimile: (214) 999-7703

<u>**PLEASE PREPARE FOR SERVICE VIA LOUISIANA LONG-ARM STATUTE,
LOUISIANA REVISED STATUTE 13:3201, ET SEQ.**</u>

**Glen DeVelario**
**General Partner**
**Berman Valerio & Pease, LLP a/k/a Berman DeValerio**
**One Liberty Square**
**Boston, Massachusetts**

TRUE COPY

DEPUTY CLERK, CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA.

JUN-20-01 WED 11:54 AM    LEBLANC,WADDELL,LLC    FAX N   225 769 8713    P. 05

JUN-19-01 TUE 11:08 AM   LEBLAN  WADDELL,LLC    FAX NO. 225 769 8713    P. C

LAW OFFICES

## LEBLANC & WADDELL, LLC
ATTORNEYS AT LAW

Essen Centre, Suite 420
5353 Essen Lane
Baton Rouge, Louisiana 70809
TEL. (225) 768-7222 FAX: (225) 768-7999
(E-MAIL) attorneys@lw-law.net
WEBSITE www.lw-law.net

June 19, 2001

Mr. Glen DeValerio
Jeffrey C. Block
BERMAN, DEVALERIO & PEASE, LLP
One Liberty Square
Boston, MA 02109

Bernard Charbonnet, Jr.
LAW OFFICES OF BERNARD CHARBONNET
2140 Rue Royale
At Washington Square
New Orleans, Louisiana, 70116-1651

Re:    Fee Arrangements for Institutional Clients in Securities Cases with the Law
       Offices of Bernard Charbonnet and LeBlanc & Waddell, LLC

Gentlemen:

I am writing this letter to confirm our agreement regarding referral fees in the following
situation: When an institutional client is generated as a result of the efforts of LeBlanc &
Waddell, LLC (L&W) and The Law Offices of Bernard Charbonnet (BC), L&W and BC will
receive jointly:

1. Seven and one half (7.5%) of the total compensation awarded to BDP if the total
   compensation is less than BDP's lodestar.

2. Ten (10)% of BDP's of the total compensation awarded to BDP if the total compensation
   is equal to BDP's lodestar.

EXHIBIT "A"

-20-01 WED 11:54 AM   LE..RNC, WADDELL, LLC    FAX NO. 2   769 8713    P. 06

JUN-18-01 TUE 11:08 AM   LEBLA..., WADDELL, LLC ·    FAX NO. 226 769 8713    P. 03

3. Ten (10%) of BDP's lodestar amount plus 20% of all amounts greater than said lodestar if the total compensation is greater than BDP's lodestar.

4. In addition, L&W and BC will be paid their respective lodestars for work performed in such cases at lead counsel's direction.

For example, if BDP's lodestar is $100,000 the referral fee shall be as follows:

(a) $50,000 fee award; referral fee is 7.5% or $3,750.

(b) $100,000 fee award; referral fee is 10% or $10,000.

(c) $500,000 fee award; referral fee is $90,000 (10% of first $100,000 and 20% of all sums awarded above BDP's lodestar.)

The parties hereto agree that this agreement may be executed by facsimile signature and transmission and will be deemed an original.

Please sign below indicating that the above is correct and complies with agreement.

Sincerely

John R. LeBlanc III

ACREED AND ACCEPTED

BERMAN, DEVALERIO & TEASE, LLP

BY: _____
Jeffrey E. Block

THE LAW OFFICES OF BERNARD CHARBONNET

BY: _____
Bernard Charbonnet, Jr.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
------------------------------x
                               :
RUSSELL CARLSON, Individually  :
And On Behalf Of All Others    :
Similarly Situated,            :
                               :
       Plaintiffs,             :
                               :
v.                             :    Civil No. 3:00CV01621(AWT)
                               :
XEROX CORPORATION, KPMG LLP,   :
PAUL A. ALLAIRE, G. RICHARD    :
THOMAN, ANNE MULCAHY,          :
BARRY ROMERIL, GREGORY TAYLER, :
and PHILIP FISHBACH,           :
                               :
       Defendants.             :
                               :
------------------------------x
```

## RULING ON MOTION FOR AWARD OF ATTORNEYS' FEES

Louisiana State Employees' Retirement System ("LASERS"), Dr. Paul Dantzig, and Thomas Zambito (collectively, the "Lead Plaintiffs"), on behalf of themselves and the Class have moved for an order granting: final approval of the proposed settlement ("Settlement") of the above-captioned action ("Action") against Xerox Corporation ("Xerox"), KPMG LLP ("KPMG"), and six of Xerox's former or current officers and/or directors (collectively, the "Defendants") for a payment of $750 million in cash, plus interest (the "Settlement Fund"); final approval of the proposed plan of allocation (the "Plan of Allocation") for the Settlement Fund; a reimbursement award to Lead Plaintiffs for the time, services, and expenses they incurred in prosecuting the

-1-

Action; and an award of attorneys' fees and reimbursement of expenses incurred in connection with the prosecution and settlement of the Action.

The Lead Plaintiffs seek an award of attorneys' fees equal to 20% of the Settlement Fund, plus reimbursement of expenses. A fairness hearing was held on October 7, 2008, and the only objections to the Settlement were with respect to the requested award of attorneys' fees. The court has issued a separate order granting final approval of the Settlement, final approval of the Plan of Allocation, and making a reimbursement award to the Lead Plaintiffs. After considering the papers submitted by the Lead Plaintiffs and by objectors, and the arguments made at the fairness hearing, the court has concluded that an award of attorneys' fees equal to 16% of the Settlement Fund, plus $3,314,399.90 for reimbursement of expenses, is most appropriate.

## I. LEGAL STANDARD

In <u>Goldberger v. Integrated Resources, Inc.</u>, the Second Circuit held that "either the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases . . . ." 209 F.3d 43, 45 (2d Cir. 2000). These "two distinct methods" were described by the court as follows:

> The first is the lodestar, under which the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies

-2-

that figure by an appropriate hourly rate. See Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999). Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on "other less objective factors," such as the risk of the litigation and the performance of the attorneys. Id. (internal quotation marks omitted).

The second method is simpler. The court sets some percentage of the recovery as a fee. See id. In determining what percentage to award, courts have looked to the same "less objective" factors that are used to determine the multiplier for the lodestar. See Brown v. Phillips Petroleum Co., 838 F.2d 451, 454-55 (10th Cir. 1988).

Id. at 47. With respect to the use of the percentage of recovery method, however, the court noted that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen. Indeed, we encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage. Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." Id. at 50 (internal citations omitted). The court also observed that:

[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . .; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Union Carbide, 724 F. Supp. at 163 (summarizing Grinnell opinions).

Id.

-3-

Goldberger contains an informative discussion of the evolution in the Second Circuit of the standard for awarding attorneys' fees in common fund cases.  Several points are made about the percentage of recovery method.  First, the court noted that "the routine award of fees in the 20% to 30% range had led to a perception that the percentage approach increasingly tended to yield too little for the client-class" and too much for the attorneys.  Id. at 48.  (internal citation omitted).  City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974) ("Grinnell I") was a response to this perception.  In that case, the court "revers[ed] and remand[ed] a 15% fee award with instructions to base future awards on counsel's lodestar."  Id.  In City of Detroit v. Grinnell Corp., 560 F.2d 1093 (2d Cir. 1977) ("Grinnell II"), the court "again revers[ed] the fee award which, though based on lodestar, amounted to about 10% of recovery and was still excessive."  Id.

Second, although "the assumption that twenty-five percent is the benchmark that district courts should award in common fund cases" the court was "nonetheless disturbed by the essential notion of a benchmark."  Id. at 51-52.  The court took note of the problem of not knowing "precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel."

-4-

Id.

Third, also in the context of why the court was disturbed by the notion of a benchmark, but with its focus on cases where the common fund was between $50 million and $75 million, the court made an observation that suggested it would be reasonable to expect to see a general trend of lower percentages of the fund being awarded for attorneys' fees as the size of the fund increased:

> Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions. "Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." Union Carbide, 724 F. Supp. at 166. Indeed, empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%. See Lynk, 23 J. Legal Stud. at 202; see also 1 Conte, Attorney Fee Awards § 2.09 (putting range at 13% to 20%).

Id. at 52.

Fourth, in the same context, the court commented on "the principal analytical flaw in . . . [the] assumption that there is a substantial contingency risk in every common fund case." The court stated:

> We harbor some doubt that this assumption is justified in cases such as this. At least one empirical study has concluded that "there appears to be no appreciable risk of non-recovery" in securities class actions, because "virtually all cases are settled" . . . Of course, we are not suggesting that compensation for risk is never permitted, merely that it is not—under either the percentage or lodestar methods—an appropriate starting

> assumption. Even where there is some contingency risk but
> recovery remains virtually certain, we question whether
> a fully informed group of plaintiffs able to negotiate
> collectively would routinely agree to pay their lawyers
> a fee of 25% of a multi-million dollar settlement.

Id. (internal italics omitted). The court then made the point
that "plaintiffs in common fund cases typically are not fully
informed. Nor are they able to negotiate collectively, or at
arm's length." Id. at 49.

The court also made several observations about the lodestar
method. First, the court observed that district courts have
found that the lodestar method "created a temptation for lawyers
to run up the number of hours for which they could be paid." Id.
at 48. Second, "the lodestar created an unanticipated
disincentive to early settlements." Third, the court noted that
the "primary source of dissatisfaction" was that the lodestar
method "compell[ed] district courts to engage in a gimlet-eyed
review of line-item fee audits," which led to "an inevitable
waste of judicial resources." Id.

II. DISCUSSION

    A. Fee Awards in Other Large PSLRA Settlements

    In support of their fee application, the Lead Plaintiffs'
have submitted a report prepared by a retired federal judge. See
Private Memorandum Opinion (the "Wolin Report")(Doc. No. 493, Ex.
1.) The Wolin Report includes a chart of the Top 26 post-PSLRA
settlements, not including this case (the "Top 26 Chart"). The

-6-

settlement in this case will be the tenth largest post-PSLRA

settlement when included on this chart.  The Wolin Report

concludes that the fee request by Plaintiffs' Counsel is

consistent with fee awards in similar cases:

> The fee request at issue is on par with fee awards in
> similar cases in the Second Circuit.  See, e.g., In re
> Adelphia Communs. Corp. Sec. and Derivative Litig., No.
> 03 MDL 1529 (LMM), 2006 WL 3378705, at *1, *3 (S.D.N.Y.
> Nov. 16, 2006)(awarding 21.4% of $455 million fund); In
> re Freddie Mac Sec. Litig., No. 03-CV-4261 (JES), slip
> op. at 1 (S.D.N.Y. Oct. 27, 2006)(awarding 20% of $410
> million fund); In re Oxford Health Plans, Inc. Sec.
> Litig., No. MDL-1222 (CLB) slip op. at 7 (S.D.N.Y. June
> 12, 2003)(awarding 28% of $300 million fund); In re
> Priceline.com, Inc. Sec. Litig., Civ. No. 00-1884 (AVC),
> 2007 WL 2115592, at *5 (D. Conn. July 20, 2007)(awarding
> 30% of $80 million fund).

> Lead Counsel's fee request is also consistent with fee
> awards in other jurisdictions.  See, e.g., In re Rite Aid
> Corp. Sec. Litig., 146 F. Supp. 2d 706, 736, n.44 (E.D.
> Pa. 2001)(awarding 25% of $193 million fund); In re Rite
> Aid Corp. Sec. Litig., 362 F. Supp. 2d 587, 588-90 (E.D.
> Pa. 2005)(awarding 25% of $125 million fund); In re
> DaimlerChryslerAG Sec. Litig., No. Civ.A. 00-993, slip
> op. at 43-50 (D. Del. Feb. 5, 2004)(awarding 22.5% of
> $300 million fund); In re Williams Sec. Litig., No. 02-
> cv-072 (SPF)(FHM), slip op. at 2 (N.D. Okla. Feb. 12,
> 2003)(awarding 25% of $311 million fund).

Wolin Report at 17.  This summary from the Wolin Report only

lists cases where the fees awarded were 20% or more of the amount

of the common fund.  However, a review of the Top 26 Chart

reveals that in only 6 of the 26 cases were the fees awarded 20%

or more of the amount of the common fund.  The largest common

fund out of which fees equal to 20% or more of the amount of the

fund were awarded was the $480 million fund in the Adelphia case.

-7-

The size of the common fund in the other 5 of those cases ranged from $300 million to $410 million.

| RANK | NAME | Settlement Amount | Fee Award |
|---|---|---|---|
| 1 | Enron | $7,227,390,000.00 | 9.52% |
| 2 | WorldCom | $6,133,000,000.00 | 5.48% |
| 3 | Tyco | $3,200,000,000.00 | 14.50% |
| 4 | Cendant (2000) | $3,166,000,500.00 | 1.73% |
| 5 | AOL/Time Warner | $2,500,000,000.00 | 5.90% |
| 6 | Nortel I | $1,142,775,308.00 | 3.00% |
| 7 | Royal Ahold | $1,100,000,000.00 | 11.88% |
| 8 | Nortel II | $1,074,265,298.00 | 7.74% |
| 9 | McKesson | $1,042,500,000.00 | 7.64% |
| 10 | Cardinal Health | $600,000,000.00 | 18.00% |
| 11 | Lucent | $517,000,000.00 | 17.00% |
| 12 | BankAmerica | $490,000,000.00 | 18.00% |
| 13 | Dynegy, Inc. | $474,050,000.00 | 8.73% |
| 14 | Adelphia Comm. | $460,000,000.00 | 21.40% |
| 15 | Raytheon | $460,000,000.00 | 9.00% |
| 16 | Waste Management II | $457,000,000.00 | 7.93% |
| 17 | Global Crossing | $447,800,000.00 | 16.04% |
| 18 | HealthSouth | $445,000,000.00 | 15.25% |
| 19 | Freddie Mac | $410,000,000.00 | 20.00% |
| 20 | Qwest | $400,000,000.00 | 15.00% |
| 21 | Cendant (2006) | $374,000,000.00 | 7.71% |
| 22 | Rite Aid | $319,580,000.00 | 25.00% |
| 23 | Williams Co. | $311,000,000.00 | 25.00% |
| 24 | Oxford | $300,000,000.00 | 28.00% |
| 24 | DaimlerChrysler | $300,000,000.00 | 22.28% |
| 24 | Bristol-Myers Squibb | $300,000,000.00 | 3.96% |
| -- | Xerox | $750,000,000.00 | -- |

Based on an assumption that there would be a general trend (but not a pattern from which there would be no deviation) of the percentage of the fund awarded as attorneys' fees being smaller as the size of the fund increases, the court has placed the cases on the Top 26 Chart into three groups: (i) settlements below $500 million, (ii) settlements in the range of $500 million to $1.2 billion, and (iii) settlements of $2.5 billion or greater.

-8-

Of the fifteen cases in the first group, the fee award percentage was 20% or greater in six cases, 15% or greater but less than 20% in four others, and less than 10% in five of the cases.

Of the five cases in the third group, the fee award percentage was less than 10% in four of the cases. In In re Tyco Intern., LTD. Multidistrict Litig., 535 F. Supp. 2d 249 (D.N.H. 2007) ("Tyco"), it was 14.50%. In Tyco, co-lead counsel argued that the court "should compare their fee request with the fees that were awarded in connection with the sixteen post-PSLRA securities fraud cases with settlements at or above $400 million." Id. at 266. Two objectors argued that the court "should limit [its] comparative analysis to a subset of cases in which the settlements exceeded $1 billion." Id. The court observed:

> These "super mega-fund" cases are: WorldCom, Cendant, AOL Time Warner, Nortel I, Royal Ahold, and Nortel II. The objectors contend that the comparison set should be limited to such cases because super mega-fund cases are a distinct subclass in which the size of the recovery is explained more by the size of the class than the work expended by counsel. As a result, the objectors argue, super mega-fund cases—Tyco included—require comparatively lower POF awards to fairly compensate counsel than will be required in cases with smaller settlements.

Id. While 14.50% was greater than the fee award percentage in any of the super mega-fund cases, 14.50% was "in line with the POF awards for the other cases in the class (seventh out of seventeen)." Id. at 266-67. In determining whether to limit its

-9-

comparative analysis to super mega-fund cases, the court in Tyco

found it helpful to look at the lodestar expressed as a

percentage of the settlement amount:

> The objectors' contention that super mega-fund cases
> warrant lower POF awards than smaller cases because they
> require proportionally less work may well be true as a
> general matter. See generally In re Prudential Ins. Co.
> Am. Sales Practice Litig. Agent Actions, 148 F.3d 283,
> 339 (3d Cir. 1998)("the basis for this inverse
> relationship [between the settlement amount and the
> appropriate POF] is the belief that in many instances the
> increase [in recovery] is merely a factor of the size of
> the class and has no direct relationship to the efforts
> of counsel" (internal quotations omitted)). However, the
> generalization on which the objectors' argument depends
> does not hold in this case.  The best measure of the
> effort required to produce a particular result in a given
> case is the lodestar.  In this case, the lodestar
> expressed as a percentage of the settlement amount is
> 5.38%. As Appendix 1 demonstrates, this "lodestar
> percentage" is substantially higher than the lodestar
> percentages for all but one of the super mega-fund cases
> and it is much more closely aligned with the lodestar
> percentages in the larger set of cases that Co-Lead
> Counsel have proposed for comparison purposes.  In other
> words, whether or not super mega-fund cases generally
> require proportionally less effort than smaller cases,
> the generalization is not true in this case.

Id. at 267.

In the instant matter, however, the lodestar is

$95,942,272.25 and the settlement amount is $750 million.  So the

lodestar expressed as a percentage of the settlement amount is

12.79%.  Of the eleven cases in the first and second groups, the

lodestar expressed as a percentage of the settlement amount

exceeds 5.34% in only one case: in Lucent it is 7.98%.  In the 15

cases in the third group, the lodestar expressed as a percentage

-10-

of the settlement amount exceeds 8.62% in only two cases. See
Appendix A. In Williams Companies, where the settlement amount
was $311 million, the percentage was 17.18%, and in Oxford, where
the settlement amount was $300 million, the percentage was
15.64%.

The Top 26 Chart reflects that in Williams Companies, the
case was at the summary judgment stage at the time of settlement
and 18,000,000 pages of documents had been reviewed and 150
depositions had been taken. It reflects that in Oxford, the case
settled on the eve of trial and 1,000,000 pages of documents had
been reviewed and 56 depositions had been taken. In the instant
case, settlement was at the stage where merits discovery was
ongoing.

There are six other cases in the second group. The court
concludes that the second group of cases is the most appropriate
set of cases to use for the purpose of comparative analysis
because (i) the $2.5 billion dollar settlement in AOL-Time Warner
is twice the settlement amount in Nortel I, and (ii) the
settlement amount in the instant case falls fairly close to the
midpoint of the range of settlement amounts in the cases in the
second group, and there is a larger gap between the settlement
amounts in Lucent and Bank of America than between the settlement
amounts in Bank of America and Dynegy, Inc.

The Top 26 Chart reflects the following about the instant

-11-

case and the cases in the second group, with the multiplier for the instant case being the proposed multiplier and the column "Lodestar as Percentage" being the court's calculation based on the numbers on the Top 26 Chart (except with respect to Xerox):

| Case | Multiplier | Fee Award % | Stage of Case Upon Settlement | Pages Reviewed | Depositions | Lodestar as Percentage |
|---|---|---|---|---|---|---|
| Nortel I | 2.1 | 3.00 | Class Certification | 2,000,000 | 0 | 1.46 |
| Royal Ahold | 2.6 | 11.88 | Class Certification | 15,000,000 | 65 | 4.62 |
| Nortel II | 4.6 | 7.74 | Class Certification | 10,000,000 | 12 | 1.62 |
| McKesson | 2.1 | 7.64 | Merits Discovery | 2,000,000 | 0 | 3.68 |
| Cardinal Health | 5.9 | 18.00 | Merits Discovery | 7,200,000 | 0 | 3.06 |
| Lucent | 2.1 | 17.00 | Class Certification | 3,000,000 | 75 | 7.98 |
| Xerox | 1.56 | 20.00 | Merits Discovery | 4,000,000 | 7 | 12.40 |

The Top 26 Chart also reflects that in Royal Ahold and McKesson, there were parallel criminal proceedings against company executives.

The Wolin Report also contains a comparison of the settlement amount and the amount of the settlement with the Securities and Exchange Commission ("SEC") in cases where there were parallel SEC proceedings:

| Case | SEC Settlement | Class Settlement | Ratio of SEC/ Class Settlement |
|---|---|---|---|
| Tyco | $50,000,000 | $3,200,000,000 | 1.6% |
| Xerox | $61,878,132 | $750,000,000 | 8.3% |
| AOL/Time Warner | $300,000,000 | $2,650,000,000 | 11.3% |
| WorldCom | $750,000,000 | $6,133,000,000 | 12.2% |
| Bristol-Myers Squibb | $150,000,000 | $300,000,000 | 50.0% |
| Qwest | $250,000,000 | $400,000,000 | 62.5% |

-12-

See Wolin Report, Exhibit C.  The Top 26 Chart reflects that in each of these cases except the instant case and Bristol-Myers Squibb, there were parallel criminal proceedings against company executives.[1]

### B. Objections to Request for a 20% Fee Award

A number of persons filed objections to the request for a fee award equal to 20% of the Settlement Fund, and objectors appeared and were heard at the fairness hearing.  Many of the objections related to the use of contract attorneys.  There were three points raised by objectors in this area.

Objectors argued that the lodestar is inflated because contract attorneys performed "paralegal tasks" and were not properly supervised.  The court finds these arguments unpersuasive.  At the fairness hearing, Plaintiffs' Co-Lead Counsel explained the document review program developed for this case and the function performed by contract attorneys. Plaintiffs' Co-Lead Counsel also explained the training given to contract attorneys, how their work was monitored and reviewed, and how they were supervised and in some instances removed

---

[1] Although the Top 26 Chart does not reference parallel criminal proceedings for the Bristol-Myers Squibb case, the Wolin Report states that there were parallel criminal proceedings.  See Wolin Report at 31-32.  In fact, after the PSLRA settlement in 2004, the company entered into a deferred prosecution agreement with the U.S. Attorney's Office in New Jersey.  See United States Department of Justice, Deferred Prosecution Agreement, http://www.usdoj.gov/usao/nj/ press/files/pdffiles/ deferredpros.pdf (last visited Jan. 14, 2009).

because their performance was not adequate.  An email from one of

the objectors to his supervising lawyer from one of the co-lead

counsel firms undermines both these arguments by objectors.  (See

Lead Plaintiffs' Second Supplemental Response to Objections

("Plaintiffs' Second Supp. Resp.") (Doc. No. 517, Ex. 3).)

    Objectors also argued that the lodestar is inflated because

contract attorneys should have been billed as an expense instead

of contract attorney work being billed at the rate of $300 per

hour.

> A contract attorney is one hired "to work on a single
> matter or a number of different matters, depending upon
> the firm's staffing needs and whether the temporary
> attorney has special expertise not otherwise available to
> the firm . . . . Economics is the princip[al] reason for
> emergence of lawyer 'temping' because it permits a firm to
> service client needs during particularly busy periods by
> engaging an experienced attorney, without incurring the
> expense of hiring a permanent employee." George C. Rockas,
> Lawyers For Hire and Associations of Lawyers: Arrangements
> that Are Changing the Way Law is Practiced, 40 DEC B. B.J.
> 8 (November/December 1996).

In re Enron Corp. Sec., Deriv. & "ERISA" Litig., No. H-01-1446,

2008 WL 4178130, at *34 (S.D. Tex. Sept. 8, 2008) ("In re

Enron").  "'[T]oday it is not uncommon for an employing law firm

to pay the temporary lawyer at one rate and charge that lawyer's

services to the client at a higher rate that covers overhead and

a contribution to firm profits.' Kathryn M. Fenton, Use of

Temporary or Contract Attorneys, 13-FALL Antitrust 23, 24

(1998)."  Id. at *35.  Also, "under ABA Formal Opinion No.

-14-

00-420, an attorney may bill the contract attorney's charges to the client as fees rather than costs when the client's reasonable expectation is that the retaining lawyer has supervised the work of the contract lawyer or adopted that work as her own." Id. (internal citations omitted). See also ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 08-451, at 5-6 (2008).

Plaintiffs' Co-Lead Counsel explained at the fairness hearing the process followed in hiring contract attorneys and the supervision given their work. This objection was rejected by the court in Enron, and was also rejected by the court in Tyco. See 535 F. Supp. 2d at 272. This court finds the objection unpersuasive for substantially the same reasons.

Objectors make a third argument, which is an extension of the second point. In addition to arguing that contract attorney time should not be included in the lodestar, they also argue that a multiplier should not be applied to $300 an hour contract attorney time. Objectors argue that contract attorneys here were paid $55 an hour or less and their hours were included in the lodestar at $300 an hour; different rates have been cited for what contract attorneys were paid but for purposes of discussion, the court uses the rate of $55 an hour. Objectors contend that in determining what the multiplier is in this case, the court should use $55 an hour for that portion of the lodestar attributable to contract attorney work instead of $300 an hour.

In effect, these objectors argue that including contract attorney time in the lodestar at the rate of $300 an hour sufficiently compensates Plaintiffs' Counsel for the risk of being paid nothing in this case, and that applying a multiplier to that portion of the lodestar results in excessive compensation, particularly in a case where the majority of the lodestar is made up of contract attorney time.  The objectors point to one portion of the lodestar that is an extreme situation.  One firm involved in the case has a lodestar of $4,716,187.50 and approximately 98% of that lodestar is attributable to work by contract attorneys.

Plaintiffs' Counsel's records reflect that of the total lodestar of $95,942,272.25, $60,452,031.00, i.e. 63.0%, is attributable to work by contract attorneys.  Of the 290,759.57 total hours, the portion attributable to work of the contract attorneys is 201,506.77 hours, i.e. 69.3%.  (See Plaintiffs' Second Supp. Resp. at Ex. 2.)  Plaintiffs' Co-Lead Counsel point out that these percentages are in line with the percentage of the lodestar that represented contract attorney hours for lead counsel in the Tyco case.  (See id. at 3-4.)  Plaintiffs' Co-Lead Counsel also point out that if the charges for the contract attorney time were decreased, the multiplier in this case would still be a reasonable multiplier.  They note that if 40% of the total hours of contract attorneys was eliminated, the total lodestar would be $71,761,462.20 and granting their request for a

-16-

20% fee award would equate to using a 2.09 multiplier.  (See id.
at Ex. 2.)  They further note that making even a 90% reduction in
contract attorney time and granting their request for a 20% fee
award would equate to using a multiplier of only 3.59, which is
about the 3.6 average, and not much above the 3.1 median, of the
multipliers in the cases on the Top 26 Chart.  But the court
notes that in Tyco the multiplier was only 2.70, and as discussed
above, the lodestar as a percentage of the fund was 5.34%,
compared to 12.79% in the instant case.  As to the other cases on
the Top 26 Chart, the court does not have complete data showing
to what extent, if any, the lodestar consists of work done by
contract attorneys or what was the economic impact of using
contract attorneys.  In fact, the court does not have all of the
relevant data necessary to perform a quantitative analysis in
this case.  Moreover, while those questions merit further study
and analysis, undertaking such an analysis for this case, where
there is sufficient information about other cases that can be
used in determining a reasonable fee award percentage, would be
the functional equivalent of a "gimlet-eyed review of line-item
fee audits" in terms of a waste of judicial resources.
Goldberger, 209 F.3d at 49.  Thus, the court concludes that it is
not objectionable per se in this case to apply a multiplier to a
lodestar that includes work performed by contract attorneys, even
though the profit margin for the firms employing them was greater

-17-

than the profit margin the firms would have had for work done by full-time employees.

Objections were also made to the effect that the notice given to the class was inadequate; that attorneys' fees should be paid out of the "net fund" (i.e. after payment of expenses) as opposed to the "gross fund";[2] that the amount of attorneys' fees requested was per se too much; and that no fees should be awarded because Milberg LLP participated in the case, and former Milberg LLP partner Melvyn Weiss (who filed an appearance in this case) and Seymour Lazar (who was never a named plaintiff in this case) were named in a federal indictment filed against Milberg LLP. The court has considered each of these objections and concluded that they lack merit for substantially the reasons set forth by Plaintiffs' Co-Lead Counsel in their memoranda.  There was also an objection to the effect that the attorneys' fee award should be limited to a 15% benchmark.  However, it is clear that under Goldberger, benchmarks should not be used.  Each case must be given individualized consideration.

Objectors also argue that the 1.56 multiplier is not reasonable because there was little risk to Plaintiffs' Counsel in taking the case and that this is a mega-fund case so a lower

---

[2] See In re Enron, 2008 WL 4178130, at *26 (stating that "under the agreement between Lead Counsel and the Regents, expenses were to be "netted" (deducted from the whole recovery) before applying fee percentages for fee award to Lead counsel").

percentage should be used.  These are factors that the court addresses in its discussion below of the Goldberger factors.

**C. The Goldberger Factors**

The first Goldberger factor is the time and labor expended by counsel.  Here, Plaintiffs' Counsel have documented that 290,759.57 hours of attorney and litigation support time were devoted to the case.  The Top 26 Chart reflects that the average number of billable hours for those cases is 102,652 and the median is 44,075.  A greater number of billable hours is reported on the Top 26 Chart for only one case: Tyco (488,270 hours).  Enron (289,593 hours), which the Top 26 Chart reflects was at the trial preparation stage, and Worldcom (277,861 hours) come close.

The second Goldberger factor is the magnitude and complexity of the litigation.  The court agrees with Plaintiffs' Co-Lead Counsel that the fraud alleged in this action involved multiple accounting standards that touched on numerous aspects of a multinational corporation's business, implicated operating units around the world, and spanned five annual reporting periods.  The court also agrees that the rudiments of the accounting principles at issue in the case were complex, as were numerous other aspects of the case.  Also, the Top 26 Chart reflects that the duration of this case was 3.58 years longer than the average duration of the cases on the chart.

-19-

The third <u>Goldberger</u> factor is the risk of the litigation. Approximately two months before any complaint was filed in this case, defendant Xerox reported that the SEC had begun an investigation of accounting issues related to its operations in Mexico, and approximately one month before any complaint was filed in this case, defendant Romeril told analysts during a conference call that several senior managers in Mexico had collaborated to circumvent Xerox accounting policies and administrative procedures.  In all, 22 separate lawsuits were filed seeking to assert the claims raised in this action.  The court originally appointed four firms as co-lead counsel, and after a contested motion was filed (which also resulted in LASERS being appointed as one of the Lead Plaintiffs), two of the original four co-lead counsel were replaced by one of the current lead counsel. (<u>See</u> Superseding Order Appointing Lead Plaintiffs, Lead Counsel, and Liaison Counsel (Doc. No. 92).)  Although this case was complex and of great magnitude, there was a surplus of experienced and knowledgeable counsel who presumably assessed the risks and wanted to serve as lead counsel.  Thus, it appears to the court that on balance the litigation risks here were at most those presented by a typical case, and that this case falls within the category of cases mentioned in <u>Goldberger</u> for which the presence of a substantial contingency risk is not an appropriate starting assumption.  See <u>Goldberger</u>, 209 F.3d at 52.

-20-

The fourth Goldberger factor is the quality of representation. The court agrees with Plaintiffs' Co-Lead Counsel that the Class received high quality legal representation and obtained a very large settlement in the face of vigorous opposition by highly experienced and skilled defense counsel. With respect to this factor, the court also places weight on the fact that among the group of cases listed in the Wolin Report where there were parallel SEC proceedings, counsel in this case obtained a larger settlement in comparison to the SEC settlement than in any case except Tyco, and the fact that in those other cases, there were parallel criminal proceedings being pursued or apparently contemplated against company executives.

The fifth Goldberger factor is the requested fee in relation to the settlement. As discussed above, in only six of the cases on the Top 26 Chart were the fees awarded 20% or more of the settlement amount. A 20% fee award would be a higher percentage than in any other case in the second group, i.e. cases where the settlements were in the range of $500 million to $1.2 billion. On the other hand, Plaintiffs' Counsel are requesting that a multiplier of 1.56 be applied to the lodestar. Such a multiplier would rank as the second lowest (higher only than the 1.5 multiplier used in Williams Companies) on the Top 26 Chart, and the lodestar would rank as the second highest on the Top 26 Chart.

-21-

All the cases in the second group were either at the stage of class certification or "merits discovery ongoing."[3] Two of the cases had fee award percentages approaching 20%. In <u>Cardinal Health</u>, the percentage was 18%, and 7,200,000 pages of documents had been reviewed and no depositions had been taken. In <u>Lucent</u>, the fee award percentage was 17%, and 3,000,000 pages of documents had been reviewed and 75 depositions had been taken. Here, 4,000,000 pages of documents have been reviewed and 7 depositions have been taken. However, when comparing this case to <u>Cardinal Health</u> and <u>Lucent</u>, the figures of 4,000,000 pages of documents reviewed and 7 for the number of depositions taken does not adequately reflect either the effort or value of the work

---

[3] The court notes that in comparing the instant case to the cases in the second group, the court does not place weight on <u>Nortel I</u>, where the fee award percentage was 3%. There, the Second Circuit concluded that the district court had carefully weighed the six <u>Goldberger</u> factors before concluding that a fee award percentage of 8.5% was excessive. <u>See In re Nortel Networks Corp. Sec. Litig.</u>, 539 F.3d 129, 134 (2d Cir. 2008). However, the court noted:

> Milberg also argues that the district court erred by not using the 8% Nortel II award as a "benchmark," especially because, according to Milberg, Nortel II presented fewer litigation risks than Nortel I. We have little doubt that a 3% fee award, with a 2.04 lodestar multiplier, is toward the lower end of reasonable fee awards, and we are troubled by the district court's failure to discuss Nortel II and why it believed the fee award here to be more reasonable. But the question before us is not whether we would have awarded a different fee, but rather whether the district court abused its discretion in awarding this fee.

<u>Id.</u>

-22-

performed by Plaintiffs' Counsel.  Pursuant to the discovery

program adopted by Plaintiffs' Co-Lead Counsel, the 4,000,000

pages of documents produced by the Defendants consisted of key

documents on which the SEC had focused its attention.

Ordinarily, a much greater number of documents would have been

produced before lead counsel had obtained 4,000,000 pages of key

documents.  In addition, Plaintiffs' Counsel reviewed and

digested all of the deposition transcripts produced by the

Defendants from the SEC litigation and prior investigations.

There were 68 days of deposition transcripts taken from 48

witnesses during the SEC litigation, and, in addition, 87 days of

investigative deposition transcripts taken from 39 witnesses

during the SEC investigations.

In Tyco, where a multiplier that was below the average and a

number of billable hours that were the most in any case on the

Top 26 Chart resulted in a requested fee award percentage that

was materially higher than that in any case with a comparable

total settlement amount, the court found it helpful to look at

the lodestar as a percentage of the settlement amount.  The court

also finds such an approach to be helpful here.  The fee award

percentage is obtained by taking the product of the multiplier

times the lodestar, and dividing that product by the settlement

amount.  When one focuses on the multiplier, one is focusing on

the components of the fee award percentage other than the

-23-

lodestar as a percentage of the total settlement amount. Thus, in assessing a multiplier, looking at the lodestar as a percentage of the settlement amount provides perspective on the other parts of the equation.

As noted above, the lodestar expressed as a percentage of the settlement amount for this case, i.e. 12.79%, is higher than in all but two of the cases on the Top 26 Chart, i.e. Williams Companies and Oxford, which settled at the summary judgment stage and on the eve of trial, respectively. A significant gap exists between 12.79% and the next three highest numbers: Freddie Mac (8.62%), HealthSouth (7.99%), and Lucent (7.98%). Based on the fact that Plaintiffs' Counsel in this case accomplished such a good result when the settlement amount in the Action is compared to the amount of the settlement with the SEC, the court concludes that it is reasonable for the lodestar as a percentage of the settlement amount to be higher than in the cases on the Top 26 Chart other than Williams Companies and Oxford. Having reviewed the results of using various fee award percentages other than 20%, the court has determined that using a fee award percentage of 16% and assuming a multiplier of 1.56 would have the same effect as adjusting the lodestar so that the lodestar expressed as a percentage of the settlement amount would be 10.26%. This percentage would be higher than the percentage in all the cases on the Top 26 Chart except Williams Companies and Oxford, and

-24-

higher than the 7.98% in <u>Lucent</u>, which is the only other case in the second group that has a percentage that is greater than one-half of 10.26%.

Using a fee award percentage of 16% would also be in the upper range of the cases in the second group, lower than only the 18% in <u>Cardinal Health</u>, where the total settlement amount was $600 million, and the 17% in <u>Lucent</u>, where the settlement amount was $517 million. Also, a fee award percentage of 16% would equate to $120 million of the $750 million settlement amount. With a lodestar of $95,942,272.25, this would equate to a multiplier of 1.25 as opposed to 1.56. The only argument against such a multiplier is that it is simply too low. However, looking at the totality of the circumstances, the court concludes that increasing the fee award percentage above 16% just so the multiplier can be larger is not merited. In any event, a fee award percentage of 16% results in an increase over the lodestar of almost $25 million, which is not insignificant.

Although LASERS is one of the Lead Plaintiffs, it was initially not a Lead Plaintiff, and the court has not been presented with any retainer agreement in this case, unlike <u>Cendant</u> and <u>WorldCom</u>, where retainer letters provided some guidance as to the market for legal services. However, 16% is a higher percentage than was awarded in either of those cases. Notably, in <u>Cendant</u> "two leading class action firms agreed to a

-25-

fee scale, for settlement during discovery, of 17.5 percent for a recovery up to $100 million; 10 percent between $100 and $300 million; 7.5 percent between $300 and $500 million; and 5 percent above $500 million." In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., No. 02 Civ. 5575(SWK), MDL 1500, 2006 WL 3057232, at *13, (S.D.N.Y. Oct. 25, 2006). Also, in WorldCom, the "retainer agreement contained a tiered percentage structure, depending upon the size of the recovery and the stage at which it was achieved . . . ." Id. at *12. The structure was: 12% to 14% of any amount up to $100 million; plus 11% to 13% of any amount in the range of $100 million to $250 million; plus 9% to 12.5% of any amount in the range of $250 million to $500 million; plus 5.5% to 7.5% of any amount in the range of $500 million to $1 billion; plus 4.0% to 5.5% of any amount over $1 billion. Id.

The sixth Goldberger factor is public policy considerations. "[P]ublic policy supports granting attorneys['] fees that are sufficient to encourage . . . counsel to bring securities class actions that supplement the efforts of the SEC." In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229, 236 (S.D.N.Y. 2005). Such a policy does not translate into granting a fee award in the amount requested in every case. Rather, the court must give individualized consideration to each case. If the court utilizes a fee award percentage of 16% in this case, $120 million is larger than the fee awards in all of the cases in

the second group, i.e. cases where the settlement amount was $500 million to $1.2 billion, except <u>Royal Ahold</u>, where the fee award was $130,647,868.98 and the settlement amount was $1.1 billion. It would also be larger than the fee award in any case in the third group of cases, i.e. cases where the total settlements were below $500 million, and it would be $65 million greater than the fee award in <u>Cendant</u>, where the total settlement was in excess of $3.166 billion.  Thus, the court concludes that a fee award percentage of 16% here is sufficient to encourage counsel to continue to represent individuals in cases such as this one.

**III. CONCLUSION**

For the reasons set forth above, the court hereby awards Plaintiffs' Counsel attorneys' fees equal to 16% of the Settlement Fund, plus $3,314,399.90 for reimbursement of expenses.

It is so ordered.

Dated this 14th day of January 2009 at Hartford, Connecticut.

_____/s/ AWT_____
Alvin W. Thompson
United States District Judge

## Appendix A

| RANK | NAME | Settlement Amount | Lodestar | Lodestar as POF |
|---|---|---|---|---|
| 1 | Enron | $7,227,390,000.00 | $127,000,000.00 | 1.76% |
| 2 | WorldCom | $6,133,000,000.00 | $83,183,239.00 | 1.36% |
| 3 | Tyco | $3,200,000,000.00 | $170,742,994.00 | 5.34% |
| 4 | Cendant (2000) | $3,166,000,500.00 | $13,038,825.00 | 0.41% |
| 5 | AOL/Time Warner | $2,500,000,000.00 | $46,861,731.00 | 1.87% |
| 6 | Nortel I | $1,142,775,308.00 | $16,655,971.00 | 1.46% |
| 7 | Royal Ahold | $1,100,000,000.00 | $50,858,606.00 | 4.62% |
| 8 | Nortel II | $1,074,265,298.00 | $17,429,370.00 | 1.62% |
| 9 | McKesson | $1,042,500,000.00 | $38,339,176.00 | 3.68% |
| 10 | Cardinal Health | $600,000,000.00 | $18,378,123.00 | 3.06% |
| 11 | Lucent | $517,000,000.00 | $41,260,585.00 | 7.98% |
| 12 | BankAmerica | $490,000,000.00 | $28,805,991.00 | 5.88% |
| 13 | Dynegy, Inc. | $474,050,000.00 | $10,162,042.00 | 2.14% |
| 14 | Adelphia Comm. | $460,000,000.00 | $33,686,468.00 | 7.32% |
| 15 | Raytheon | $460,000,000.00 | $13,160,578.00 | 2.86% |
| 16 | Waste Management II | $457,000,000.00 | $6,842,457.00 | 1.50% |
| 17 | Global Crossing | $447,800,000.00 | $28,242,915.00 | 6.31% |
| 18 | Health South | $445,000,000.00 | $35,551,918.00 | 7.99% |
| 19 | Freddie Mac | $410,000,000.00 | $35,353,395.00 | 8.62% |
| 20 | Qwest | $400,000,000.00 | $18,547,454.00 | 4.64% |
| 21 | Cendant (2006) | $374,000,000.00 | $6,038,717.00 | 1.61% |
| 22 | Rite Aid | $319,580,000.00 | $10,237,106.00 | 3.20% |
| 23 | Williams Co. | $311,000,000.00 | $53,435,010.00 | 17.18% |
| 24 | Oxford | $300,000,000.00 | $46,910,652.00 | 15.64% |
| 24 | DaimlerChrysler | $300,000,000.00 | $15,865,520.00 | 5.29% |
| 24 | Bristol-Myers Squibb | $300,000,000.00 | $5,192,155.00 | 1.73% |
| | Xerox | $750,000,000.00 | $95,942,272.25 | 12.79% |

BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO

ATTORNEYS AT LAW

ONE LIBERTY SQUARE
BOSTON, MA 02109
TEL: (617) 542-8300
FAX: (617) 542-1194

WWW.BERMANESQ.COM
LAW@BERMANESQ.COM

425 CALIFORNIA STREET, 21ST FLOOR
SAN FRANCISCO, CA 94104
TEL: (415) 433-3200
FAX: (415) 433-6382

222 LAKEVIEW AVENUE, SUITE 900
WEST PALM BEACH, FL 33401
TEL: (561) 835-9400
FAX: (561) 835-0322

December 7, 2005

Bernard Charbonnett
2140 Rue Royale
At Washington Square
New Orleans, LA 70116-1651

Re:    Referral Agreement

Dear Bunny:

    After careful consideration of all of the recently changed relationships with the Louisiana pension funds, we have concluded that it is time to terminate the referral agreement between our two firms dated June 19, 2001. Accordingly, we are notifying you of termination of the Agreement effective immediately.

    In addition, we want to make clear that all of the cases presently pending remain subject to the referral fee agreement as set forth in the June 19, 2001 letter and will be a honored according to its terms.

    We appreciate all of your cooperation and assistance and we wish you well in the future.

                    Sincerely,

                    Glen DeValerio

Waybill #: 29006617555



Origin: **BOS**
Date Printed: 12/7/2005

Webship API 02.00 (01/2004)

To:
Law Office of Bernard Charbonnet
2140 Rue Royale
At Washington Square
New Orleans, LA 70116
UNITED STATES

Attention To:  Bernard Charbonnet
Phone #:       4042525066

Service:

# E

Special Service:

Route:
## NEW 9P

**DHL**
www.dhl.com

**Worldwide** EXPRESS
www.wwexship.com

From:
BERMAN DEVALERIO PEASE
TABACCO BURT & PUCILLO
ONE LIBERTY SQUARE
BOSTON, MA 02109
UNITED STATES

Sent By: Glen DeValerio
Phone #: 617-542-8300

Description:
Weight (lbs.): 1       Dims:0 X 0 X 0
Pieces:        1 of 1
Bill Shipment To: Sender
Ship Ref:      0099

— — — — — — — — — — Please fold or cut in half — — — — — — — — — — — .
## DO NOT PHOTOCOPY
Using a photocopy could delay the delivery of your package and will result in additional shipping charge

Create New Shipment          View Pending Shipments

DHL Signature (optional)_____  Route_____ Date_____ Time_____

 **Worldwide** EXPRESS.

For Tracking, please go to www.dhl-usa.com or call 1-800-CALL-DHL
Thank you for shipping with DHL Worldwide Express

LAW OFFICE OF

# BERNARD L. CHARBONNET, JR.

BERNARD L. CHARBONNET, JR.
DARRYL HARRISON
DESIRÉE M. CHARBONNET
BERYL F. THOMPSON, II
TIFFANY A. PETERS

ONE CANAL PLACE
365 CANAL ST. SUITE 1155
NEW ORLEANS, LA 70130

(504) 949-0996
TELEFAX (504) 949-1001

March 16, 2009

**BY HAND DELIVERY**
Baron & Budd
Attn: Burton Leblanc, Esq.
6955 Perkins Rd.
Baton Rouge, LA 70808

Re: *Xerox Litigation Fee Agreements*

Dear Burton:

Enclosed herewith please find the fee agreements date February 2, 2001 and June 19, 2001 entered into, by and between Berman, DeValerio & Pease LLP and Leblanc & Waddell, LLC., and The Law Office of Bernard L. Charbonnet, Jr.

You will notice that the June 19, 2001 fee agreement was entered into to further clarify our arrangement and is signed by all parties concerned.

As you know under Louisiana law and subsequent agreement supersedes the prior, and in this case it is my opinion that the June 19, 2001 correspondence certainly does just that.

You will also note, that the June 19, 2001 correspondence references any fee awarded to our firm to be derived from the "total compensation" awarded to BDP.

I will look forward to discussing this matter with you further at your earliest convenience.

Sincerely, I remain,

Respectfully,

Bernard L. Charbonnet, Jr.

Blcjr/lna

Enclosures

**EXHIBIT "D"**



**BARON Ⓑ BUDD**
A PROFESSIONAL CORPORATION

Baron & Budd, P.C.          www.baronandbudd.com
3102 Oak Lawn Ave., Suite 1100    214.521.3605
Dallas, Texas 75219-4281      fax 214.520.1181

March 30, 2009

<u>**Via Email and Fax No. 617-542-1194**</u>

Mr. Glen DeValerio
Berman DeValerio Pease Tabacco Burt & Pucillo
One Liberty Square
Boston, MA 02109

       Re:   Xerox Fee

Dear Glen:

     Thank you for your letter of February 9, 2009 (addressed to Burton LeBlanc) with the enclosed check of $479,913.65. If we have not done so previously, let us again congratulate you on your great result in the subject Xerox case. We appreciate all that you and your firm have accomplished for our clients.

     We have also been aware of and received copies of the more recent correspondence between Bernard (Bunny) Charbonnet, Jr. and you of March 2, 2009, and your response thereto of March 6, 2009.

     Following those letters, we (Charbonnet and Baron & Budd) have again reviewed the fee agreements of February 2, 2001 and June 19, 2001. We do not have a copy of the June 18, 2001 document, which you reference in your recent March 6 letter. However, from our reading of the June 19, 2001 agreement, which you noted "clarified" prior communication/agreements, it appears clear that the L&W/Charbonnet fees are calculated from the "total compensation awarded BDP" – not calculated "after any other fee which Berman DeValerio must pay to another referring attorney in regard to a case involving LeBlanc & Waddell, et al.."

     In order to short circuit the letter writing and get some closure on this issue, we would like to propose a conference call between our firms and yours as soon as possible. While we are arranging that call, could you kindly send me (i) the June 18, 2001 document you referenced, and (ii) a complete recapitulation of the Xerox fee calculation, including the fee and percentage split among all lead counsel, as well as all detail of the "Less: Other Referral Obligations" category from your February 9 letter?

          TEXAS   |   CALIFORNIA   |   LOUISIANA   |   OHIO

**EXHIBIT "E"**

Mr. Glen DeValerio
Page Two
March 30, 2009

In the interim, Baron & Budd, P.C. is holding your Check No. 1307 ($479,913.65) pending resolution of our concerns.

We appreciate your continued efforts to resolve these questions.

Yours very truly,

Lance A. Pool

LAP/krj



BD

BERMAN DeVALERIO

RECEIVED
MAR 0 9 2009

March 6, 2009
Via Overnight Delivery

Bernard L. Charbonnet, Jr., Esq.
The Law Offices of Bernard L. Charbonnet, Jr.
One Canal Place
New Orleans, LA  70130

  Re: Xerox Referral fee

Dear Bunny:

  I am in receipt of your letter dated March 2, 2009 in which you raise concerns about the calculation of your referral fee in the Xerox Securities litigation case.  We believe the calculation is consistent with the June 18, 2001 letter agreement between Berman DeValerio and LeBlanc & Waddell, as further clarified by the June 19, 2001 letter agreement among Berman DeValerio, LeBlanc & Waddell and your firm.  The June 18th letter provides in Item 3-d that referral fees due to LeBlanc & Waddell, et al, will be calculated after any other fee which Berman DeValerio must pay to another referring attorney in regard to a case involving LeBlanc & Waddell et al.  In Xerox, we had another referring attorney who brought an initial client to us which allowed us into the case.  We feel that we have calculated the amounts correctly and they represent fair and appropriate fees to the parties involved.

  I cannot say that my recollection corresponds with yours regarding the referral fee calculation in the Bristol Myers II case.  I recall that you were unhappy with your fee in the case and we made an accommodation, paying you an additional $50,000.00 in May 2005.  My further recollection is that the $42,000 you refer to in your letter related to advances against future fees.

  You reference correspondence supporting your concerns.  If I am overlooking something and you have further correspondence that I may not have reviewed, please forward it to my attention and I will consider the matter further.

One Liberty Square  ▪  Boston, MA  ▪  02109  ▪  Tel: 617-542-8300  ▪  Fax: 617-542-1194  ▪  www.bermandevalerio.com

BOSTON     SAN FRANCISCO     PALM BEACH GARDENS

**EXHIBIT "F"**



**BERMAN DeVALERIO**

     As to your request for the amount which we held back pending appeal, notice of appeal has been filed in the case. We are awaiting the actual appellant filing in order to assess the validity of their arguments and our response. Accordingly, we are not in a position to release the remaining fee at this point in time.

     Please call me if you have any questions.

               Sincerely,

               Glen DeValerio

cc: Roger LeBlanc

Enclosures



BERMAN DEVALERIO

April 6, 2009
Via Fax 214-520-1181 and
Overnight Delivery

Lance Pool, Esq.
Baron & Budd P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, Texas 75219-4281

     Re:   Xerox Referral fee

Dear Mr. Pool:

     I am in receipt of your letter dated March 30, 2009. Thank you for your kind words regarding the case, we also believe it was a good result. We are hopeful that the appeals filed will be quickly adjudicated.

     As we noted in our response to Mr. Charbonnet, we believe the calculation is consistent with the agreements among the Firms. As requested, I have enclosed the June 18, 2001 letter agreement between Berman DeValerio and LeBlanc & Waddell for your reference. This letter was further clarified by the June 19, 2001 letter agreement among Berman DeValerio, LeBlanc & Waddell and the Law Offices of Bernard Charbonnet, Jr. We draw your attention to Item 3-d in the June 18th letter which provides: "In calculating BD&P's Net Attorney fee hereunder, the percentage paid to L&W shall be calculated *after* payment of any referral fee to any other attorney or law firm that is entitled to receive a referral fee as a result of BD&P's representing a Referred Client." In Xerox, we had another referring attorney who brought an initial client to us which allowed us into the case. Once again, we feel that we have calculated the amounts correctly and they represent fair and appropriate fees to the parties involved.

     Due to the sensitive nature of our agreements with referring counsel, we cannot provide the calculation you request as it would violate confidentiality by providing key terms of such agreements.

     The agreement among lead counsel was to split fees evenly among the group after providing for payment to non-lead counsel who assisted in litigating the case.

One Liberty Square • Boston, MA • 02109 • Tel: 617-542-8300 • Fax: 617-542-1194 • www.bermandevalerio.com

BOSTON              SAN FRANCISCO             PALM BEACH GARDENS

**EXHIBIT "G"**



## BERMAN DeVALERIO

After reviewing this correspondence, should you still wish to have a conference call, we will try to find a mutually agreeable time for the call.

Please call me if you have any questions.

Sincerely,

Glen DeValerio

Enclosures

ATTORNEY'S NAME: Klotz Jr, William  17877
AND ADDRESS:    365 Canal St,  Ste 1700
                New Orleans    LA 70130

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
STATE OF LOUISIANA

NO:    2009 — 05510      1                          SECTION:      6 – L

BARON & BUDD, P.C.    ET AL VERSUS BERMAN, DEVALERIO, & PEASE, LLP

C I T A T I O N

TO:  GLEN DEVALERIO
     THROUGH: GENERAL PARTNER
     BERMAN VALERIO & PEASE, L.L.P. A/K/A BERMAN DEVALERIO
     ONE LIBERTY SQUARE
     BOSTON                    MA

YOU HAVE BEEN SUED:

You must either comply with the demand contained in the petition
FOR DECLARATORY JUDGMENT AND GENERAL DAMAGES  w/ Exhibits Attached
a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the Clerk of
this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within thirty (30) days after the
service hereof under penalty of default.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
*                          ADDITIONAL INFORMATION                          *
*  Legal assistance is advisable.  If you want a lawyer and can't find one, you may call the New Orleans Lawyer  *
*  Referral Service at 561- 8828.  This Referral Service operates in conjunction with the New Orleans Bar Association.  *
*  If you qualify, you may be entitled to free legal assistance through the New Orleans Legal Assistance Corp.; you  *
*  may call 529 - 1000 for more information.                                *
*  COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE                   *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

IN WITNESS HEREOF,  I have hereunto set my hand and affix the seal of the Civil District Court for
the Parish of Orleans, State of LA      May 29, 2009      .

Clerk's Office, Room 402, Civil Courts Building,          DALE N. ATKINS,  Clerk of
421 Loyola Avenue                                         The Civil District Court
New Orleans, LA                                           for the Parish of Orleans
                                                         State of LA

                                                         by _____
                                                                    Deputy Clerk

_____

SHERIFF'S  RETURN
(for use of process servers only)

PERSONAL SERVICE                          DOMICILIARY SERVICE

On this _____ day of _____    On this _____ day of _____

_____ served a copy of the w/l petition   _____ served a copy of the w/l petition
FOR DECLARATORY JUDGMENT AND GENERAL DAMAGES   FOR DECLARATORY JUDGMENT AND GENERAL DAMAGES

On                                        On
   GLEN DEVALERIO                            GLEN DEVALERIO

THROUGH: GENERAL PARTNER                   THROUGH: GENERAL PARTNER

                                          by leaving same at the dwelling house, or usual place of
                                          abode, in the hands of _____
        Returned  same  day               a person of suitable age and discretion residing therein as
                                          a member of the domiciliary establishment, whose name
_____  No._____   and other facts connected with this service I learned by
                                          interrogating  HIM / HER the said _____
     Deputy Sheriff of _____    GLEN DEVALERIO
Mileage: $_____

_____/ ENTERED /_____         being absent from the domicile at time of said service.
   PAPER                  RETURN           Returned  same  day
                                                                    No._____
_____/_____/_____
  SERIAL NO.    DEPUTY    PARISH           Deputy Sheriff of _____